## APPEAL OF D. B. DEARBORN, JR.

Docket No. 2196.    Submitted April 30, 1925.    Decided June 12, 1925.

Partnership income was derived principally from commissions
for negotiating charter parties, computed upon fixed percentages
of the charter hire.  Commissions were earned when charters

were signed, but the amounts were not ascertained or paid until the owner received his charter hire. Tentative estimates of commissions earned were entered in a "commission" book, and thereafter, when ascertained and paid, the exact amounts of such commissions also were entered therein. Estimated commissions were not transferred to any other books, and at the end of each year commissions actually paid were totaled and transferred to profit and loss accounts for the respective years in which the charters were signed, such accounts being held open for that purpose. Other partnership income and expenses apparently were accounted for on a cash basis. *Held*, that the method of accounting employed did not clearly reflect the partnership net income, and under section 212(b) of the Revenue Act of 1918 the cash receipts and disbursements method should be applied in ascertaining the individual tax liability of the partners.

*George E. Cleary, Esq.*, for the taxpayer.
*Ward Loveless, Esq.*, for the Commissioner.

Before STERNHAGEN, PHILLIPS, and LOVE.

This appeal is from a deficiency in income tax of $4,010.62 for the calendar year 1918. The Commissioner determined that the books of D. B. Dearborn & Co., a partnership of which the taxpayer was a member, were kept on a cash receipts and disbursements basis instead of on an accrual basis, which determination resulted in an increase in taxpayer's distributive share.

FINDINGS OF FACT.

The taxpayer was a member of the partnership of D. B. Dearborn & Co., which was during the year 1918 engaged in the business of steamship agents and brokers, and as such derived its income in a large part from commissions or brokerage on charters of vessels and management fees. The taxpayer had a one-third interest in this partnership.

The income received by the taxpayer was derived from (1) commissions on chartering ships, (2) management fees for the operation of ships, (3) insurance commissions, and (4) interest on bank deposits. The major portion of the income was from commissions or brokerage on chartering ships, and the manner of doing business was as follows: When a charter was negotiated for an owner of a vessel, the brokerage was fixed at a percentage of the freight or charter hire. As soon as the charter was signed, the firm entered upon its "commission" book a synopsis of the transaction, and entered thereon, in red ink, an estimate of the commission. The signing of the charter party was all that was necessary for the earning of the commission by the firm. The commissions, however, were not actually paid until the freight or charter hire was paid to the

vessel owner, which was, in most instances, within several months after the charter was negotiated. Later, when the exact amount of the commission was known, the amount was entered, in black ink, opposite the original estimate, and the date paid was indicated in red ink. A typical example of the entries covering a ship charter was as follows:

| | April 30, 1918 | |
|---|---|---|
| | S. S. Ryder Hanify                     Chartered to | |
| Paid 6/7/18 [1] | Terrer & Robassa<br>Cargo of Sugar<br>from Cienfuegos to New Orleans<br>at 39½¢ per 100 lbs.<br>J. R. Hanify & Co.          Commission 2½   $375 [1]<br>12,597 Bags   4,122,900 lbs. at 39½¢   $16,253.59 | $406. 34 |

[1] In red ink.

In the above illustration the amount $375 was entered on the books April 30, 1918, the date of the signing of the charter, and represented the estimated commission. The amount $406.34 was actually collected and the correct amount of the commission, and the notation at the left, "Paid 6/7/18," indicated when paid. The estimated amounts of the commissions, appearing in the commission book, were not transferred to any other books of the firm, but the cash received amounts, appearing in the commission book, were columnized and subsequently entered into an account of the ledger, called by the taxpayer a profit and loss account. The estimated commissions were not transferred to a ledger. At the end of each year all the commissions paid were transferred to this so-called profit and loss account of the ledger for the respective years in which the charters were signed. Thus, an item of 1917 business collected in 1918 would go into the profit and loss account of 1917, which would be held open for that purpose.

The difference between the estimated commissions and the actual commissions depended upon whether there was any variance in the estimated capacity of the vessel, whether the vessel was loaded to full capacity, the amount of demurrage, if any, whether there was an extension in the time covered by the charters, and for causes specified in charters. For the year 1918 there was a variance of about 6 per cent. The estimated commissions on the books for 1918 were $86,424.88, while the amount subsequently collected for these same transactions was $92,915.88 (collected in 1918 and 1919). At the end of the year 1918 there was collected $48,806.73 of the 1918 business, and there were outstanding accounts (estimated commissions) of $39,737.64, making a total of $88,544.37.

The charters contained provisions respecting payment of commissions substantially as follows:

Commission of five per cent (5%) of the estimated amount of Freight and Demurrage is due on assignment hereof to D. B. Dearborn & Company, ship lost or not lost.

It was the established practice, however, in the ship brokerage business for the owner of the vessel to pay the commission for negotiating a charter after he had received his freight or hire money, and not until then.

During the calendar year 1918 the partnership received, in addition to commissions, a small income from interest on deposits in the bank, which was credited from month to month during the year, totaling $662.67.

The expenses of the business were relatively small as compared with the net income and collections. These expenses were paid when due and payable. There was no evidence as to how the expenses were kept on the books, whether they were accrued or whether they were set up as paid.

If the books of D. B. Dearborn & Co. for the year 1918 were considered to have been kept on a cash receipts and disbursements basis, the taxpayer's distributive share for 1918 would amount to $23,326.55, while if considered on the accrual basis the taxpayer's distributive share would be $12,003.39. The Commissioner held that the income of the partnership should be computed on a cash receipts and disbursements basis, and thereupon, as a result of the increased income distributable to the taxpayer, asserted additional income taxes in the sum of $4,010.62.

### DECISION.

The determination of the Commissioner is approved.

### OPINION.

STERNHAGEN: The parties rely upon different applications of section 212(b) of the Revenue Act of 1918—the taxpayer contending that his net income is properly reflected upon the accrual basis because that is the method of accounting regularly employed in keeping the partnership books, while the Commissioner contends that the method of accounting employed by the partnership as shown by the evidence does not clearly reflect the taxpayer's income and that the cash basis should be used. There is no dispute between the parties that upon the cash basis the Commissioner's deficiency has been correctly computed.

We need not undertake to define the accrual basis. It is sufficient that in this appeal we agree with the Commissioner's view that the

taxpayer's net income is more clearly reflected upon the cash basis than upon that which he urges. There is here no clear or well-established method of accounting. An elaborate system is apparently not necessary. There are, however, several sources of the partnership's income, and necessarily some expenses. The principal income of the partnership is from commissions and the only book of account brought to our attention is a book of original entry called a commission book, in which there is made at the time of the signing of a charter an entry in red ink of the estimated earnings. This entry does not purport to be more than an estimate and almost always varies to some extent from the amount finally received. Sometimes it is less and sometimes more. The expenses are not kept in this book but they are apparently always accounted for at the time of payment. So far as appears from the record there is no substantial reason for adopting an accrual method rather than a cash method, and for no other purpose than the individual tax liability of this taxpayer would the method of accounting be important. Indeed, from the standpoint of measuring income it would seem more reasonable to tax the partners upon what they actually receive than upon what they think they will receive as the charter parties are from time to time negotiated.

This is not a situation where the estimates are merely exceptional or incidental items in a larger consistent system of accounts. The entire earnings of the business are here involved and the alleged accrual basis is sought to be evolved from this crude practice of tentative estimates. If for any reason the estimates should prove to be excessive they would not measure the taxpayer's tax liability. Conversely, he should not be permitted to substitute his own estimates for the income which he actually receives.